UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL MCDONEL,                                    Case No. 19-11508

     Plaintiff,                                       Stephanie Dawkins Davis
v.                                                  United States District Judge

CITY OF DETROIT, *et al*.,

     Defendants.

_____ /


**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 23)**

## I.    INTRODUCTION

Plaintiff, Michael McDonel, accuses the City of Detroit and two of its police officers of violating his constitutional rights under the Fourth, First, and Fourteenth Amendments of the United States Constitution and seeks relief pursuant to 42 U.S.C. § 1983.  In particular, McDonel alleges that Officers Ryan Klein and Nicholas Urista illegally stopped him and investigated him for merely speaking to them in a manner they did not like and asking them their names on the evening of March 22, 2018.  While McDonel's complaint alleges several other constitutional and state law violations, in his response to Defendants' Motion for Summary Judgment, he abandons his federal claims under 42 U.S.C. §§ 1983 and 1985 for conspiracy, excessive force, and malicious prosecution, as well as his state law

1

claims for false arrest, false imprisonment, excessive force, malicious prosecution, and gross negligence.[1]  Defendants moved for summary judgment as to all of McDonel's claims.  But Plaintiff defends against summary judgment only as to his claims for "wrongful seizure/search" under the Fourth Amendment, retaliation under the First Amendment, and municipal liability against the City.  (ECF No. 27, PageID.503).  Thus, the court's analysis centers on these claims.  Having taken the matter under advisement following a hearing on the motion, Plaintiffs' wrongful seizure and retaliation claims survive, but his municipal liability claim fails. Therefore, for the reasons that follow, summary judgment is **GRANTED IN PART AND DENIED IN PART**.

## II.    FACTS

On March 22, 2018, at around 9:20 p.m., two Detroit Police Department ("DPD") officers, Defendants Klein and Urista, initiated a traffic stop of a white Nissan near the new Providence Baptist church in the city of Detroit.  (ECF No. 23-2, PageID.171; ECF No. 27, PageID.513).  The lot has two side-by-side gates,

---

[1] McDonel filed an initial "Response and Brief in Opposition to Defendants' Motion for Summary Judgment," (ECF No. 24), and two separate documents entitled "Corrected Response and Brief in Opposition to Defendants' Motion for Summary Judgment Plaintiff's Response In Opposition to Defendants' Motion for Summary Judgment (sic)," (ECF Nos. 25 and 27), on the same day.  The latter two filings largely appear to be duplicates of one another with the principal, if not only, difference being a change in font size.  For clarity, the court treats the last-filed response as McDonel's response to the motion and will also consider the appendix filed with ECF No. 25 because McDonel, presumably inadvertently, neglected to attach it to his last response.

an east-side gate for exiting the parking lot and a west-side gate for entering it.

Both the east and west gates were still open.  (ECF No. 27, PageID.513).  The

police car and the Nissan pulled into the driveway of the New Providence Baptist

Church and stopped by the east-side gates.  (*Id.*)  Plaintiff, Michael McDonel, was

working as a maintenance supervisor at the church and one of his responsibilities

was to close and chain the gates to the church's parking lot.  (*Id.* at PageID.511.)

The officers parked their car behind the Nissan and got out; Urista went to

the driver's side of the Nissan to talk to the driver while Klein first looked through

the passenger side front and back seats with his flashlight and then moved to the

back of the vehicle to read the Nissan's license plate number to dispatch.  (Exhibit

A, Klein Body Cam, 00:45-02:05).  A hanging shirt partially obstructed Klein's

view through the passenger window.  (*Id.* at 01:02).

While Klein was at the back of the Nissan, McDonel drove from the church

and through the west-side gates to close the gates for the night.  (ECF No. 27,

PageID.514).  He got out of his vehicle and first closed and locked the west-side

gates.  (*Id.*)  As officer Klein flashed his light through the passenger side of the

Nissan, he initiated the following exchange with McDonel:

> Klein: How's it going?
> McDonel: [something inaudible]
> Klein: Yes sir and yourself?
> McDonel: I have to lock up, brother.
> Klein: What's that?
> McDonel: I have to lock up, brother.

> Klein: You're going to have to wait man.
> McDonel: I didn't hear you.
> Klein: You're going to have to wait.
> McDonel: I'm gonna have to wait?
> Klein: Yes sir.
> McDonel: Well you're gonna have to hurry up then brother.
> Klein: No sir. It's on my time today.
> McDonel: You're on private property too now.
> Klein: Ok, that's fine. You ain't gonna tell me what to do.
> McDonel: I ain't trying to tell you what to do. I'm just trying to do my job.
> Klein: And I'm doing mine too.  So you can calm down sir, or you can go to jail for obstruction.

(Exhibit A, Klein Body Cam, 02:10–02:52).  During the conversation, Klein turned off his flashlight and appeared to continue facing the Nissan.  (*Id.*)  After telling McDonel to calm down, Klein then walked back to the patrol car.  At the same time, Urista walked over to McDonel and began talking to him:

> Urista: What was that?
> McDonel: I'm trying to do my job like y'all doing y'all job.
> Urista: And what's your job?
> McDonel: To close these gates my brother.
> Urista: Alright my brother, that ain't gonna happen; we've got to do our job.

(*Id.* at 02:51–02:59).

Urista then walked away, but McDonel, believing the officers were being rude (ECF No. 27, PageID.516), asked for Urista's name.  (Exhibit A, Klein Body Cam, 03:00).  He asked him to repeat it twice and then asked Klein for his name. (*Id.* at 3:05).  Immediately after McDonel asked for their names and as he walked

4

back towards his vehicle, Urista asked McDonel to produce his identification, which he immediately did. (*Id.* at 03:11–03:25). Urista told him, "One sec," and Klein told him, "Just go ahead and stay right there." (*Id.* at 3:29).

The officers returned to their patrol car where Klein remarked, "Let me see that fuckers' ID," referring to McDonel. (*Id.* at 03:40). Urista then replied, "I think that's a warrant . . . interfering." (*Id.* at 03:49). He also indicated that the driver they had initially stopped in the white Nissan was "good to go," while Klein ran McDonel's information through the in-car computer. (*Id.* at 03:55). Chuckling, Klein noted, albeit mistakenly, that McDonel's driver's license was suspended. (*Id.* at 03:58). Urista responded that they could take his "whip," and Klein said that "he's not supposed to be driving." (*Id.* at 04:34–04:39). In the meantime, McDonel was explaining to someone on the phone that he had just told the officers that he had to lock the gates. Overhearing him, Klein remarked, "Yeah, with an attitude." (*Id.* at 05:20–05:24).

Klein asked Urista how they wanted to handle McDonel. (*Id.* at 05:56). Urista responded, "He was interfering with a police investigation. We'll give him a ticket for that." (*Id.* at 05:58–06:01). They also agreed to tow his vehicle because he was operating it with a suspended license. (*Id.* at 06:01–06:06).

The officers then got out of the patrol car. Urista approached the Nissan and let the owner know he was good to go. (*Id.* at 06:15). They then approached

McDonel, who had remained standing where the officers had left him in the lot. Klein explained to McDonel that he was operating a motor vehicle on a suspended driver's license.  (*Id.* at 07:23).  McDonel responded that his license was expired, not suspended, so the officers returned to the patrol car to check.  (*Id.* at 07:44). McDonel was correct; his license had expired a few weeks earlier on his birthday.

The officers were uncertain if McDonel could operate his vehicle on an expired licensed, so they called another officer, "Garrison."  (*Id.* at 11:35).  In explaining the situation to Garrison, Klein noted that McDonel was interfering. (*Id.* at 12:05).  Klein asked if having an expired license was just a ticketable offense and whether McDonel could drive his vehicle.  (*Id.* at 12:12–12:17).  He also asked if they could tow his vehicle, wanting to make sure because he "didn't want to do something he wasn't supposed to do."  (*Id.* at 13:05–13:13).  After he got off the phone, Klein explained to Urista that "you can tow his shit if you want to."  (*Id.* at 13:34).  Klein then noticed that McDonel's license had only recently expired, so he called Garrison again to see if that changed anything, and was assured that it did not.  (*Id.* at 14:24–15:32).  Klein then requested a tow.  (*Id.* at 17:17).  While still in the car, the officers had the following conversation:

> Klein: My man's about to be pissed off.
> Urista: He shouldn't have been doing that.  He's screamin at me, I mean screamin at you.
> Klein: Well that's the thing. He was like you're going to have to hurry up. Excuse me, it's gonna be on my time today bud.

> Urista: And not only that, I need you to be watching the
> other guy . . . . That's not cool.
>
> * * *
>
> Klein: He didn't have to have an attitude.
> Urista: Why is he doing that, man?  That's what I don't
> understand.
> Klein: I don't either.
> Urista: He caused himself to be investigated.

(*Id.* at 17:25–18:06).

The officers then left their vehicle again and informed McDonel that they were citing him for interference and obstruction under Detroit City Code § 31-2-2 and for driving with an expired license.  (*Id.* at 24:22–25:40).  Urista explained, "What I was observing, is you distracting my partner.  I need my partner's eyes in the vehicle just in case there's a weapon in the vehicle.  I need my partner's attention in order to be doing a traffic investigation.  You were yelling at my partner." (*Id.* at 24:45–24:59).  Urista said he also had to disengage his contact with the citizen he was investigating in order to focus on McDonel.  (*Id.* at 24:59–25:09).  As a result, McDonel was "open for investigation for interfering with a city employee with the performance of their duty."  (*Id.* at 25:10–25:15).  He also explained that his expired license was a civil infraction and that they were towing his car.  (*Id.* at 25:18–25:26).

McDonel then asked to get his things out of the car, which they allowed  (*Id.* at 25:44).  But he also advised officers, for the first time, that he had a concealed

permit license ("CPL") and a loaded weapon in his vehicle.  (*Id.* at 26:08).  Klein

told him that he was supposed to disclose that as soon as McDonel started talking

to the officers. (*Id.* at 26:21).  McDonel then also mentioned to the officers that he

was not trying to be "rude" or "disrespectful."  But Klein responded, "Well, the

way you came off was kind of disrespectful."  (*Id.* at 26:40).  Klein also added,

"When we're doing something, this is our safety, do you understand that.  When

you distract us from what we're doing, you just made everyone unsafe."  (*Id.*)

Upon learning of the CPL, Urista asked to check out the car himself to retrieve the

firearm, which McDonel allowed.  In addition to the firearm in the center console,

Urista also found marijuana there and, as a result, arrested McDonel.  (*Id.* at

27:44).

 While Defendants were putting McDonel in the patrol car, his mother

arrived at the scene.  (*Id.* at 29:05).  Klein explained to her that McDonel was

going to jail because he was interfering with their investigation, had a firearm, and

had marijuana.  (*Id.* at 29:15–29:28).  He noted that McDonel interfered with their

traffic stop.  "When he starts doing that, that takes the safety away from my partner

and myself.  We have to be focused on that car.  If he wouldn't have had an

attitude with us, this would probably have never happened."  (*Id.* at 30:00).[2]

---

[2] While Plaintiff quotes from Klein's deposition for additional references to McDonel's
attitude, the court declines to consider the quotes or to rely on any such references as the specific

McDonel was later released, and his citations were dismissed without prejudice.  Subsequently, McDonel filed the instant Complaint in Wayne County Circuit Court, and Defendants removed the case to this court.  (ECF No. 1).

## III.  DISCUSSION

### A.    Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).  Furthermore, the evidence and all reasonable inferences must be

---

transcript pages from which the quotations purportedly were taken do not appear to be in the record.

construed in the light most favorable to the non-moving party. *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact,

the burden of demonstrating the existence of such an issue then shifts to the non-

moving party to come forward with "specific facts showing that there is a genuine

issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  That is,

the party opposing a motion for summary judgment must make an affirmative

showing with proper evidence and to do so must "designate specific facts in

affidavits, depositions, or other factual material showing 'evidence on which the

jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F. Supp. 2d 905,

910 (6th Cir. 2004).  In order to fulfill this burden, the non-moving party needs to

demonstrate only the minimal standard that a jury could ostensibly find in his

favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797,

800 (6th Cir. 2000).  However, mere allegations or denials in the non-movant's

pleadings will not satisfy this burden, nor will a mere scintilla of evidence

supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The court's role is limited to determining whether there is a genuine dispute

about a material fact, that is, if the evidence in the case "is such that a reasonable

jury could return a verdict for the nonmoving party." *Id.* at 248.  Such a

determination requires that the court "view the evidence presented through the

prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254.

Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of

the evidence, on a motion for summary judgment the court must determine whether

a jury could reasonably find that the plaintiff's factual contentions are true by a

preponderance of the evidence. *See id.* at 252–53. Finally, if the nonmoving party

fails to make a sufficient showing on an essential element of its case for which it

carries the burden of proof, the movant is entitled to summary judgment. *Celotex*,

477 U.S. at 323. The court must construe Rule 56 with due regard not only for the

rights of those "asserting claims and defenses that are adequately based in fact to

have those claims and defenses tried to a jury," but also for the rights of those

"opposing such claims and defenses to demonstrate in the manner provided by the

Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

### B.   Qualified Immunity

Klein and Urista argue that they are entitled to qualified immunity against

McDonel's claim of a Fourth Amendment violation because their conduct was

objectively reasonable under the circumstances. To prevail on a claim under 42

U.S.C. § 1983, McDonel must "identify a right secured by the United States

Constitution and the deprivation of that right by a person acting under color of

state law." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001)

(quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)). And

because Defendants argue that they are entitled to qualified immunity, (ECF No. 23-2, PageID.186–88), McDonel must also demonstrate, based on the circumstances, that qualified immunity is not applicable.  The doctrine of qualified immunity means that "'[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Defendants bear the burden of pleading qualified immunity, but plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly established that a reasonable official in his or her position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct.  *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002) (citation omitted) (explaining that "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity").

The Supreme Court has established a two-part test to determine whether qualified immunity is applicable to a particular situation.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The first part of the test involves a determination of whether the facts of the case, viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right."  *Id.*  If the first question is

resolved in the affirmative, then the court would decide "whether the right was clearly established." *Id.* If the answer to both questions is yes, then qualified immunity does not apply and the case can proceed. But, if the answer to either question is no, then qualified immunity acts as a shield. The court may consider the questions in whichever order the court concludes makes the most sense. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009).

Under the "clearly established" prong of the qualified immunity test, the contours of the right must be sufficiently clear such that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "A clearly established constitutional violation requires on-point, controlling authority or a robust consensus of cases of persuasive authority." *Ortega v. U.S. Immigration and Customs Enforcement*, 737 F.3d 435, 439 (6th Cir. 2013).

Even in the context of qualified immunity, however, "[o]n summary judgment, the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016). "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

Defendants argue that they are entitled to summary judgment on McDonel's

Fourth Amendment and First Amendment claims. [3]   The court addresses each of

these in turn.

        1.   <u>Fourth Amendment</u>

Defendants address McDonel's claim as a wrongful arrest claim and argue

that they are entitled to qualified immunity against this claim because "at the time

Plaintiff was arrested, he had committed or was committing, no less than five (5)

distinct criminal or civil violations." (ECF No. 23-2, PageID.188).  According to

Defendants, they had probable cause to arrest McDonel because "it is undisputed

that Plaintiff 1) was operating a motor-vehicle with an expired license; 2)

possessed a firearm on church property; 3) was in the possession of burnt and

unburnt marijuana and a loaded firearm in his vehicle; and 4) failed to promptly

disclose his CPL and concealed weapon to Officers Klein and/or Urista." (*Id.* at

PageID.185).  McDonel does not appear to dispute this.  Instead, he challenges the

initial stop.  He argues that the officers had neither reasonable suspicion nor

probable cause to stop and investigate him in the first place.  (ECF No. 27,

PageID.523).  Thus, the relevant inquiry for this court to consider is whether the

---

[3] Defendants do not clearly make an argument for qualified immunity as to Plaintiff's
retaliation claim in its opening brief, but McDonel raised the issue in his response (ECF No. 27,
PageID.526–29); Defendants' reply brief then touched upon his First Amendment claim in its
qualified immunity section (ECF No. 29, PageID.543–45).  As such, the court will address
McDonel's retaliation claim under the qualified immunity framework.

officers are entitled to qualified immunity as to McDonel's initial stop—not as to his subsequent arrest.

The Fourth Amendment secures citizens from "unreasonable searches and seizures." U.S. CONST. amend. IV. "A seizure occurs where, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Typically, the Fourth Amendment requires an officer to have probable cause before seizing a citizen. *See United States v. Hairston*, 402 F. App'x 84, 87 (6th Cir. 2010). But in *Terry v. Ohio*, the Supreme Court held that officers may conduct an "investigatory stop" when they have "reasonable suspicion" of criminal activity. 392 U.S. 1 (1968). Reasonable suspicion "requires more than just a 'mere hunch,' but is satisfied by a likelihood of criminal activity less than probable cause, and 'falls considerably short of satisfying a preponderance of the evidence standard.'" *Smoak*, 460 F.3d at 778 (quoting *United v. Arvizu*, 534 U.S. 266, 274 (2002)). "If an officer possesses 'a particularized and objective basis for suspecting the particular person . . . of criminal activity' based on 'specific and articulable facts' he may conduct a *Terry* stop." *Id.* at 778–79 (quoting *Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 813–14 (6th Cir. 1999) (citation and quotation marks omitted)). "Courts must examine the 'totality of the

circumstances' to determine whether reasonable suspicion existed to justify a *Terry*

stop." *Id.* at 779.

The parties agree that the officers stopped McDonel for his purported

interference with the officers' traffic stop of the Nissan driver. (ECF No. 23-2,

PageID.186–87; ECF No. 27, PageID.525). Detroit City Code § 31-2-2 states:

> It shall be unlawful for any person to knowingly fail to
> comply with the lawful command of a police officer, or
> knowingly interfere with or obstruct any City employee
> in the performance of such employee's duties as a City
> employee.

But, McDonel argues that the officers lacked reasonable suspicion or probable

cause that he was violating this ordinance. (ECF No. 27, PageID.524–25). He

points out that he had not failed to comply with any command by the officers. (*Id.*

at PageID.525). He also contends that he did not interfere with the officers' job, as

demonstrated by, among other things, the fact that "Klein kept his eyes trained on

the Nissan and didn't even turn or shine his flashlight away from the Nissan while

talking with McDonel." (*Id.*)

There is a genuine dispute of fact as to whether the officers had a reasonable

suspicion that McDonel was in violation of the ordinance. As McDonel correctly

points out, he did not fail to comply with any command from the officers. Indeed,

the only commands he received from the officers before the stop were to "calm

down sir, or you can go to jail" and to produce his driver's license. As to the

16

former, Defendants do not suggest that he failed to comply with this instruction.

And as to the latter, Defendants concede that when they asked McDonel for his

identification, he complied.  (ECF No. 23-2, PageID.172)

Thus, the question becomes, did the officers have a reasonable suspicion that

McDonel was either interfering with or disrupting their investigation of the white

Nissan?  The answer to this question is a mixed bag.  On the one hand, during the

course of the stop, the officers noted several times that they believed McDonel's

sideline chatter jeopardized their safety and distracted them from their traffic stop.

And McDonel can be seen on the video imploring the officers to hurry up and

advising them, in an irritated tone, that he needed to lock the gates to the lot while

they were in the midst of dealing with the Nissan driver.  But McDonel points to

facts which could belie their claim.  To begin, during their investigation of the

Nissan driver, Klein continued to face the front passenger side of the Nissan—even

while talking to McDonel.  Further, Urista approached McDonel only when Klein

started to walk back to the police car.  And, by the time Urista approached

McDonel, it appears that he had completed his investigation of the Nissan driver

because he noted that the driver was "good to go" almost as soon as they returned

to the car with McDonel's driver's license.  McDonel apparently neither physically

approached nor came closer than thirty to forty feet from the spot of the officers'

stop; instead, he remained near his vehicle during the incident.  (ECF No. 25-6, PageID.472).

More importantly, McDonel argues that his criticism and questioning of Klein and Urista could not form the basis for obstruction or interference under § 31-2-2 because case law establishes "that these 'interference' ordinances cannot be used to suppress free speech," citing *City of Houston, Texas v. Hill*, 482 U.S. 451 (1987); *Kennedy v. City of Villa Hills*, 635 F.3d 210 (6th Cir. 2011); and *People v. Rapp*, 821 N.W.2d 452 (Mich. 2012).  (ECF No. 27, PageID.525–26).  According to McDonel, this is clearly established law upon which a reasonable officer would have notice.  (*Id.*)

As McDonel's argument suggests, here the First Amendment is intertwined, at least in part, with his Fourth Amendment claim as "[a]n officer may not base his probable-cause determination on speech protected by the First Amendment."  *Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir. 2006).  The Supreme Court in *Hill* was confronted with a Houston ordinance that made it illegal to "oppose, molest, abuse or interrupt any policeman in the execution of his duty."  482 U.S. at 455.  The Court held that the ordinance was unconstitutionally overbroad under the First Amendment, noting particularly that the ordinance prohibited "verbal interruptions of police officers."  *Id.* at 461.  The Court found this problematic because the ordinance covered "verbal criticism and challenge directed at police

officers"—speech that is protected under the First Amendment. *Id.*   Moreover, the ordinance was "not narrowly tailored to prohibit only disorderly conduct or fighting words." *Id.* at 465.  The Court emphasized that the "freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–63.

The Sixth Circuit has also applied the First Amendment principles outlined in *Hill*.  In *Kennedy*, the court held that an officer did not have probable cause to arrest a plaintiff under a disorderly conduct statute after the plaintiff yelled "son of a bitch" and a "fat slob" at him in public.  635 F.3d at 212.  The court found that the Kentucky ordinance did "not criminalize arguments and noise that disturb only police officers."  As further support, the court also cited *Hill*, underscoring that "because the First Amendment requires that police officers tolerate coarse criticism, the Constitution prohibits states from criminalizing conduct that disturbs solely police officers."  635 F.3d at 216.  Therefore, the court concluded that a reasonable officer could not have concluded that probable cause existed.

Similarly, in *Patrizi v. Huff*, the plaintiff argued that officers arrested her for disorderly conduct without probable cause.  690 F.3d 459 (6th Cir. 2012).  She alleged that a police officer approached and questioned her friend at a bar regarding an assault; according to the plaintiff, she asked the officer questions "in a

calm and measured manner" regarding his investigation, "did not continuously

interrupt" or "ignore instructions," and did not exhibit any "aggressive, boisterous,

or unduly disruptive conduct." *Id.* at 465–66.  Relying on Ohio law, the court

determined that the officers lacked probable cause.  But the court also relied on

*Hill*, observing that "[a]lthough *Hill* is not directly relevant insofar as the present

case does not concern a First Amendment challenge, *Hill*'s explanation of what

conduct may and may not be criminalized must nevertheless inform this court's

analysis." *Id.* at 467.  Applying the principles from *Hill*, the court found that

"despite any arguable ambiguity in the Ohio state courts' jurisprudence, the U.S.

Supreme Court has clearly established that nonaggressive questioning of police

officers is constitutionally protected conduct." *Id.*  The plaintiff's conduct, the

court reasoned, fell "precisely within that protected ambit because, when the facts

are viewed in her favor, her conduct did not cross the line into fighting words or

disorderly conduct prohibiting the officers from conducting their investigation."

*Id.*

Detroit's interference ordinance is sufficiently similar to the laws discussed

in the preceding cases such that a reasonable jury could conclude that McDonel

was arrested based on protected speech—which cannot be the basis for reasonable

suspicion or probable cause.  *See, e.g.*, *Davis v. Williams*, 451 F.3d 759, 767 (11th

Cir. 2006) (finding officers lacked probable cause for obstruction of justice and

disorderly conduct because, in part, "a citizen [cannot] be precluded by the threat of arrest from asking to speak to an officer's superior or from asking for an officer's badge number."). Here, McDonel told the officers that he had to close the gates; told them they were on private property and needed to hurry up; and asked for their names. And while McDonel's voice may have registered irritation and impatience, he did not call the officers offensive names as in *Kennedy,* which the court found to be protected speech in any event, and viewing the facts in the light most favorable to him, his interruptions were arguably not continuous, boisterous or aggressive. As such a reasonable juror could find that his speech never ventured beyond the point of "coarse criticism" or "nonaggressive questioning," which would be considered constitutionally protected speech.

Given the genuine issues of material fact that remain in dispute, the court cannot decide qualified immunity as a question of law. *Harris v. City of Circleville*, 583 F.3d 356, 364 (6th Cir. 2009) ("When no facts are in dispute, whether an official receives qualified immunity is a question of law."); *See also Enlow v. Tishomingo Cnty., Miss.*, 962 F.2d 501, 510 (5th Cir. 1992) ("[T]he probable cause question is intertwined at least in part with the First Amendment inquiry but also includes additional factual issues. This query must go to the trier of fact.") Moreover, McDonel shows that it is clearly established that officers may

not arrest a citizen for "coarse criticism," *Kennedy*, 635 F.3d at 216, or

"nonaggressive questioning," *Patrizi*, 690 F.3d at 467.

Rather than arguing the existence of probable cause or even reasonable

suspicion for the stop, Defendants say "[a]ssuming, *arguendo*, that there was an

absence of probable cause for the Interference charge," McDonel's claim still fails

because "he was not 'arrested'" and because "if [an] arrest is made for several

offenses, justification as to one of the offenses charged will constitute a good

defense" to false imprisonment, citing *Donovan v. Guy*, 80 N.W.2d 190, 193

(Mich. 1956).  (ECF No. 23-2, PageID.186).  But neither of these arguments

works.  The first is inapt because McDonel is claiming that his stop violated the

Fourth Amendment—not his arrest.  The second is also inapt because *Donovan*

addressed a state false imprisonment claim, not an illegal *Terry* stop.

In sum, based on these facts, a reasonable jury could find that at the time the

officers initiated their stop of McDonel, they did not have a reasonable suspicion

that McDonel interfered in or obstructed the officers' traffic stop.  The court,

therefore, finds that McDonel has demonstrated a genuine dispute as to whether the

officers violated his Fourth Amendment rights.  Defendants' Motion for Summary

Judgment as to McDonel's Fourth Amendment claim is **DENIED**.

### 2.   First Amendment Retaliation

To state a *prima facie* case for retaliation prohibited by the First

Amendment, McDonel must establish the following: "(1) the plaintiff engaged in

protected conduct; (2) an adverse action was taken against the plaintiff that would

deter a person of ordinary firmness from continuing to engage in that conduct; and

(3) there is a causal connection between elements one and two—that is, the adverse

action was motivated at least in part by the plaintiff's protected conduct." *Sowards*

*v. Loudon Cnty., Tennessee*, 203 F.3d 426, 431 (6th Cir. 2000) (quoting *Thaddeus-*

*X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).  "If the plaintiff shows

that the protected conduct was at least a substantial or motivating factor behind the

defendant's adverse action, then the burden shifts to the defendant to show he

would have taken the same action even if the plaintiff had not engaged in protected

conduct." *Sevy v. Barach*, 815 F. App'x 58, 63 (6th Cir. 2020).

As with McDonel's Fourth Amendment claim, the court must begin by

determining if the parties dispute any material facts regarding whether the officers

violated his First Amendment rights. Defendants' principal argument to defeat

McDonel's retaliation claim is that "where there is probable cause to file a criminal

complaint, a plaintiff will be unable to prevail on a 1st Amendment retaliation

claim," citing *Hartman v. Moore*, 547 U.S. 250 (2006).  (ECF No. 23-2,

PageID.184).  They argue McDonel's retaliation claim fails because the officers

had probable cause to believe that McDonel drove with an expired license, possessed a firearm on church property, possessed marijuana, and failed to promptly disclose his concealed weapon.  (ECF No. 23-2, PageID.185).  In response, McDonel claims that Urista and Klein retaliated against him for asking their names by "subject[ing] [him] to an investigation, car search, car towing, arrest and ticketing."  (ECF No. 24, PageID.312).  McDonel argues that *Hartman* addressed retaliatory prosecution cases and that the Sixth Circuit limited it to that context in *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 217 n.4 (6th Cir. 2011).

Although McDonel correctly observes that *Hartman* addressed retaliatory prosecutions rather than retaliatory stops or arrests, Defendants are also correct that a plaintiff "pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest"—in addition to the three elements.  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019).  In *Nieves*, the Supreme Court found that retaliatory arrest claims involve causal complexities akin to those in retaliatory prosecution claims and, as a result, extended the probable cause requirement to retaliatory arrests.  *Id.* at 1724–25.  The Sixth Circuit has recognized as much, noting that "the Court held most recently in *Nieves* that a plaintiff generally cannot bring a retaliation claim if the police had probable cause to arrest."  *Novak v. City*

*of Parma*, 932 F.3d 421, 430 (6th Cir. 2019).  Thus, "[i]f the officers did have

probable cause . . . they are entitled to qualified immunity."  *Id.* at 429.

But even if he must prove the absence of probable cause, McDonel responds

that "an issue of fact exists whether Defendants had reasonable suspicion or

probable cause to initiate the stop and investigation" as to his alleged interference.

(ECF No. 27, PageID.528).  In other words, McDonel suggests that his *Terry*

stop—preceding his arrest—was a retaliatory action that violated his First

Amendment rights.  Regarding the stop, Defendants argue that the officers "did not

need probable cause or even reasonable suspicion to investigate" because McDonel

was a CPL holder and "was armed."  (ECF No. 29, PageID.543–44).  Under

Michigan law, a CPL holder "who is carrying a concealed pistol . . . and who is

stopped by a peace officer shall immediately disclose to the peace officer that he or

she is carrying" a weapon "upon his or her person or in his or her vehicle."  Failure

to do so is a civil infraction.  Mich. Comp. Laws § 28.425f(3)-(5).  The statutory

language plainly addresses itself to a CPL holder's responsibilities, but does not

contain language allowing officers to dispense with probable cause.  To the extent

that Defendants are suggesting that McDonel was in violation of the statute the

moment they stopped him on foot with no firearm on his person, though with a

firearm in his vehicle nearby, Defendants have offered no authority supporting this

interpretation of the statute.  And as a factual matter, he could not have been in

violation of the CPL disclosure statute before he was actually stopped; that stop would require an independent basis for probable cause.  *See United States v. Collazo*, 818 F.3d 247, 253 (6th Cir. 2016) (noting that "an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." (quoting *United States v. Blair*, 524 F.3d 740,748 (6th Cir. 2008))).  Thus, Defendants have simply not connected the dots.  In such cases, "issues adverted to in perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).  As a result, the court will not address this argument.

On summary judgment, where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  But here Defendants have not met their initial burden.  As discussed, they arguably did not have probable cause for any other offenses at the time that the challenged stop was made.  Their alternative argument that they did not need probable cause for the stop since McDonel is a CPL holder is either woefully

undeveloped and therefore waived or simply unsupported.  Nevertheless, the

officers may still be entitled to qualified immunity as to the retaliation claim if

either of the two prongs of the *Saucier* analysis is not met.  McDonel's burden,

therefore, is to show an absence of probable cause and to establish the elements for

First Amendment retaliation based on his *Terry* stop.  In particular, a plaintiff

"must point to evidence sufficient to establish" the three elements of a retaliation

claim.  *Bradenburg v. Housing Authority of Irvine*, 253 F.3d 891, 897 (6th Cir.

2001).  McDonel has met his burden.

Indeed, the court has already found that a genuine dispute of fact exists as to

whether the stop was valid.  The court, therefore, will address the remaining

elements of McDonel's retaliation claim.

### a.  Protected Activity

McDonel claims that he engaged in constitutionally protected speech when

he complained about the officers' conduct and asked for their names.  As noted

earlier, "the First Amendment protects a significant amount of verbal criticism and

challenge directed at police officers."  *Patrizi*, 690 F.3d at 467 (quoting *Hill*, 482

U.S. at 455).  And "[t]he U.S. Supreme Court has clearly established that

nonaggressive questioning of police officers is constitutionally protected conduct."

*Id.*  Here, McDonel's statements to the officers imploring them to hurry up with

their stop of the Nissan driver so that he could close the gates and asking for their

names is protected by the First Amendment. *See, e.g.*, *Johnson v. Dekalb Cnty., Georgia*, 391 F. Supp. 3d 1224, 1247–49 (N.D. Ga. 2019) (finding the plaintiff's asking for the defendant officer's name to be protected speech); *Watson v. Boyd*, 447 F. Supp. 3d 924, 947–48 (E.D. Miss. 2020) (assuming that the plaintiff's asking for the defendant officer's name and badge number was constitutionally protected speech in denying the defendant's motion for summary judgment); *Cabot v. Lewis*, 241 F. Supp. 3d 239, 255 (D. Mass. 2017) ("[C]riticizing a police officer and asking for his name and badge number is protected speech under the First Amendment.").

### b. Adverse Action

McDonel claims that the stop and investigation conducted by the Defendants constituted an adverse action. An adverse action "would chill or silence a 'person of ordinary firmness' from future First Amendment activities." *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 922 (6th Cir. 2007)). "The adverse action need not actually chill or silence the plaintiff's First Amendment activities." *Id.* "Nor must the plaintiff possess an Olympian fortitude." *Id.* at 1139–40. "A chilling effect sufficient under this prong is not born of *de minimis* threats or 'inconsequential actions,' but neither does the requisite showing permit 'solely egregious retaliatory acts . . . to proceed past summary judgment.'" *Ctr. for Bio-*

*Ethical Reform*, 477 F.3d at 822 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999)).  The court must bear in mind that "this element is not an overly difficult one for the plaintiff to meet." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010).  "[B]ecause 'there is no justification for harassing people for exercising their constitutional rights,' the deterrent effect of the adverse action need not be great in order to be actionable." *Id.* at 472 (quoting *Thaddeus-X*, 175 F.3d at 397). "The plaintiff's evidentiary burden is merely to establish the factual basis for his claim that the retaliatory acts amounted to more than a de minimis injury." *Id.* (quoting *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002)).  "Thus, unless the claimed retaliatory action is truly 'inconsequential,' the plaintiff's claim should go to the jury." *Bell*, 308 F.3d at 603 (quoting *Thaddeus-X*, 175 F.3d at 398).

Here, immediately after McDonel asked for the officers' names, the officers asked for McDonel's identification and detained him when Urista told him, "One sec," and Klein told him, "Just go ahead and stay right there."  Up to that point, McDonel's conduct only consisted of speech—telling them they were on private property, that he was trying to do his job, and that they needed to hurry up.  Klein and Urista acknowledged that, based on their training, each of these questions constituted protected speech.  (ECF No. 25-6, PageID.472; ECF No. 25-7, PageID.478).  Notably, McDonel had not moved closer to where the officers were conducting their traffic stop, attempted to shut the gate, or otherwise physically

approached the officers.  (ECF No. 25-6, PageID.472).  McDonel cites his

investigation, car search, car towing, arrest and ticketing as the adverse actions that

would deter a person of ordinary firmness.  But in that list, only the investigation

and interference ticket stemmed directly from his speech.  It may reasonably be

concluded that a person of ordinary firmness would feel deterred from criticizing

officers and asking for their names if the police could, in response to the protected

speech, demand a citizen's identification and detain them in response.  As the Sixth

Circuit has underscored, any "[d]eprivation of one's liberty of movement can

hardly be classed 'inconsequential;' indeed, the Founders endeavored scrupulously

to protect this liberty in the Constitution."  *Cntr. For Bio-Ethical Reform*, 477 F.3d

at 822 (finding "[a] two and one-half hour detention absent probable cause,

accompanied by a search of both their vehicles and personal belongings, conducted

in view of an ever-growing crowd of on-lookers, would undoubtedly deter an

average law-abiding citizen from similarly expressing controversial views on the

streets of the greater Dayton area"); *See also Cruise-Gulyas v. Minard*, 918 F.3d

494, 497 (6th Cir. 2019) (noting that an "unwarranted police stop" may constitute

an adverse action); *Klug v. Clark Cnty.*, No. 3:19-cv-06031-BHS-JRC, 2021 WL

2404180, at *7 (W.D. Wash. Mar. 3, 2021) (denying motion for summary

judgment where defendants did not dispute that the alleged retaliatory *Terry* stop—

where officers "detain[ed] plaintiff for several minutes, shin[ed] a flashlight in his

direction, and conduct[ed] a search of plaintiff's vehicle"—was an adverse action);

*Lallemand v. Cnty. Of Los Angeles*, No. LA CV17-00781 JAK (SS), 2019 WL

8989832, at *16 (C.D. Cal. Feb. 5, 2019) ("Plaintiff was seized and detained for a

period of time.  If the detention was extended by the Deputy Defendants in

retaliation for Plaintiff's exercise of his First Amendment rights, this could have a

chilling effect on future protected conduct.").  Here, while in the course of his job,

the officers detained McDonel for a period of time and delayed him from

completing his work.  A reasonable juror could find these adverse actions to be

more than inconsequential and *de minimis*.  Thus, McDonel has shown a genuine

dispute as to whether his stop constituted an adverse action, which should go to the

jury. *See, e.g.*, *Bell*, 308 F.3d at 603 ("[I]n most cases, the question of whether an

alleged retaliatory action poses a sufficient deterrent threat to be actionable will not

be amenable to resolution as a matter of law.")

       *c.*    *Causation*

McDonel contends that his protected speech motivated his stop.  According

to McDonel, "the circumstantial evidence of Defendants' anger and irritation at

McDonel's complaints is sufficient to create a jury question on Defendants' intent

to retaliate."  (ECF No. 27, PageID.529).  In particular, he points out that Urista

and Klein repeatedly referred to his "attitude" and were annoyed by him, as

demonstrated when Klein said, "Give me that fucker's ID."  (*Id.* at PageID.528).

31

"[C]ausation in retaliatory claims may really be considered a two-part inquiry: A plaintiff must show both (1) that the adverse action was proximately caused by an individual defendant's acts . . . but also (2) that the individual taking those acts was 'motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.'" *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012) (first citing *Siggers-EL v. Barlow*, 412 F.3d 693, 702 (6th Cir. 2005); then quoting *Thaddeus-X*, 175 F.3d at 386). "[R]etaliation 'rarely can be supported with direct evidence of intent.'" *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (quoting *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987)). As a result, the court may consider "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals." *Thaddeus-X*, 175 F.3d at 399.

The statements made by the officers along with the timing of his stop create a genuine dispute on the issue of causation. The officers referred to McDonel's "attitude" at several points during the events here and even identified it as the motivating factor for their action. This suggests they stopped him for his speech as opposed to interrupting their investigation. For example, Klein stated that McDonel "didn't have to have an attitude," and Urista wondered why he did so because "[h]e caused himself to be investigated." And when speaking with McDonel's mother, Klein also stated, "If he wouldn't have had an attitude with us,

this would probably have never happened." From these statements, a reasonable juror could conclude that the officers stopped and detained him because they were annoyed that he had criticized them and asked for their names.

Furthermore, the timing in this case—McDonel's asking for their names followed immediately by a request for his identification—provides additional evidence of causation. "In theory, temporal proximity between the protected conduct and the adverse action, standing alone, may be significant enough to create an inference of retaliatory motive." *Coleman v. Bowerman*, 474 F. App'x 435, 437 (6th Cir. 2012). Of course, "when other evidence of retaliatory motive is lacking, we have been reluctant to hold that temporal proximity is sufficient to establish causation." *Id.* But here, McDonel has provided more than just temporal proximity. Indeed, by the time Urista left the Nissan and approached McDonel for the first time, the officers appear to have concluded their investigation of the car they had initially stopped because Urista mentioned the Nissan was "good to go" once they reentered the police car. Given the closeness of McDonel's questioning and criticism and his alleged retaliatory act, the court finds that there is sufficient evidence from which a reasonable jury could find that the  officers intended to punish McDonel for exercising his First Amendment rights.

Again, given that material facts are in dispute as to McDonel's retaliation claim, the court cannot decide qualified immunity as a question of law. *Cf. Harris*,

583 F.3d at 364 ("When no facts are in dispute, whether an official receives qualified immunity is a question of law.").  Moreover, this circuit has repeatedly held the right to be free from a retaliatory arrest after criticizing or questioning the police is clearly established.  *Kennedy*, 635 F.3d at 219 ("Kennedy's right to be free from retaliatory arrest after insulting an officer was clearly established."); *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) ("[I]t is evident that the First Amendment right to criticize public officials is well-established and supported by ample case law.  Furthermore, it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983."); *Patrizi*, 690 F.3d at 467 ("[T]he U.S. Supreme Court has clearly established that nonaggressive questioning of police officers is constitutionally protected conduct.").  Indeed, "[m]otivation may be difficult to ascertain after the fact, but once the factfinder determines that protected speech motivated the arrest, the illegality of the arrest becomes readily 'apparent.'" *Kennedy*, 635 F.3d at 219 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Defendants' Motion for Summary Judgment as to McDonel's First Amendment claim, therefore, is **DENIED**.

### C.     *Monell* Claims Against the City of Detroit

"To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  In other words, "[a] municipality 'may not be sued under § 1983 for an injury inflicted solely by its employees or agents.'"  *Id.* (quoting *Monell*, 436 U.S. at 694).  There are four traditional ways of proving the existence of an illegal policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."  *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 880 (6th Cir. 2020) (quoting *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019)).

McDonel raises two bases for his *Monell* claim: (1) the City of Detroit's legislative enactment of Detroit City Code § 31-2-2, which McDonel contends is unconstitutional on its face, and (2) the City's policy of inadequately training or supervising.  (ECF No. 27, PageID.530).

35

1.   Unconstitutional Policy

"[T]o satisfy the *Monell* requirements a plaintiff must identify the policy, connect the policy to the city itself, and show that the particular injury was incurred because of the execution of that policy." *Wright*, 962 F.3d at 880 (quoting *Jackson*, 925 F.3d at 829).  A plaintiff must "identify a policy that is either unconstitutional on its face or can be proven to have caused a constitutional violation." *Fetterhoff v. Kerney*, No. 07-15027, 2009 WL 612346, at *9 (E.D. Mich. Mar. 6, 2009) (quoting *Raub v. Corr. Med. Servs., Inc.*, No. 06-13942, 2008 WL 5572634, at *3 (E.D. Mich. Dec. 23, 2008)).  "Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).  "Section 1983 itself 'contains no state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right." *Id.* at 405 (quoting *Daniels v. Williams*, 474 U.S. 327, 330 (1986)).  "In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized

decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Id.*

McDonel argues that Detroit City Code § 31-2-2, which the officers claim he was stopped for violating, violates the First Amendment "based on *Hill*, and various other Supreme Court and Sixth Circuit opinions." (ECF No. 27, PageID.530–31). Defendants first argue that there is no *Monell* liability because there is no constitutional violation for retaliation. (ECF No. 23-2, PageID.189–90). But as discussed, McDonel alleges a genuine dispute as to his First Amendment retaliation claim. Thus, this argument cannot serve as the basis for defeating Plaintiff's claim against the city.

As to the merits of whether the ordinance is unconstitutional, Defendants also argue that "the alleged Constitutional deprivations clearly did not arise out of a custom or policy of CITY OF DETROIT that is unconstitutional on its face." (ECF No.23-2, PageID.194). Both parties' analyses leave much to be desired on this score. But in the end, McDonel fails to demonstrate that there is any dispute of genuine fact on this issue.

In order to withstand summary judgment, McDonel must show that there is a question of fact as to whether Detroit's interference ordinance is unconstitutional on its face, as he argues it is. Generally, to show that a law is unconstitutional on its face, a plaintiff must establish "that no set of circumstances exists under which

37

[the statute] would be valid" or that "the statute lacks any 'plainly legitimate sweep[.]'" *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) (internal quotations and citations omitted) (striking down Michigan's anti-begging statute as unconstitutionally overbroad).  But when the challenge is under the First Amendment, an exception applies which transforms it to one for overbreadth.  *Id*. (citing *City of Houston v. Hill*, 482 U.S. 451, 458 (1987).  The overbreadth must be "substantial," meaning that the statute must be shown to bar "a substantial amount of protected speech both in an absolute sense and relative to [the statute's] plainly legitimate sweep[.]" *Speet*, 726 F.3d at 872.  As a result, the plaintiff need only show that "a substantial number of instances exist in which the law cannot be applied constitutionally." *Glenn v. Holder*, 690 F.3d 417, 422 (6th Cir. 2012).  As a general rule, it is the plaintiff's burden to show that a statute is overbroad. *Virginia v. Hicks*, 539 U.S. 113, 122 (2003).  To make this showing, the plaintiff must "demonstrate from the text of the [statute] and from actual fact that a substantial number of instances exist in which the [statute] cannot be applied constitutionally." *Speet*, 726 F.3d at 873 (quoting *United States Club Ass'n v. City of N.Y.*, 487 U.S. 1, 11 (1988)).

McDonel has not made such a showing.  Indeed, he has offered very little analysis of the text of the ordinance—which notably differs from the language of the ordinance struck down in *Hill* in that it does not outlaw "interruptions" but

instead addresses itself to those who, amongst other actions, "knowingly interfere with or obstruct" a city employee in the performance of the employee's duties. McDonel categorizes Detroit's ordinance as an "interference" ordinance like those that have been stricken in other municipalities as overly broad under the First Amendment.  The Supreme Court, in analyzing the city of Houston's ordinance in *Hill*, credited the Fifth Circuit's finding that the Houston ordinance had been used to arrest people for "'arguing,' 'talking,' '*interfering*,' '[f]ailing to remain quiet,' '[r]efusing to remain silent,' '[v]erbal abuse,' '[c]ursing,' '[v]erbally yelling,' and '[t]alking loudly, [w]alking through scene.'"  *Hill*, 482 U.S. at 457 (emphasis added).  All of these applications of the Houston ordinance were deemed to amount to punishment of protected speech.  Thus, in view of the Court's acknowledgment that "interfering" involves speech, McDonel's characterization of Detroit's ordinance as an interference measure that outlaws protected speech is not without basis.  Even so, McDonel has not carried the analysis through to address "substantial" overbreadth.  While he has demonstrated that a question of fact exists as to the individual Defendants' actions in ostensibly enforcing the ordinance, he has offered no evidence of other instances of enforcement efforts based solely on speech.  In *Hill*, the plaintiff had offered evidence about both the frequency of arrests made for violation of the ordinance and the type of conduct that had resulted in charges.  *Id*. at 455.  Similarly, in *Speet*, the plaintiff offered evidence

showing that the Grand Rapids police had made hundreds of stops based on the challenged ordinance and that thirty-eight percent of those stops were for speech activities.  726 F.3d at 878.  Thus, the plaintiffs in each case pointed to evidence sufficient to show that the challenged ordinances were "substantially overbroad." McDonel, on the other hand, has not offered any evidence relating to the ordinance's enforcement other than his own stop.  It is not for the court to search the record for evidence to support a party's claims.  *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n.7 (5th Cir. 1992))).  And without such evidence, he is unable to demonstrate that there is a genuine issue of material fact as to municipal liability.

The court, therefore, **GRANTS** Defendants' Motion for Summary Judgment as to McDonel's unconstitutional policy claim under *Monell*.

### 2.   Failure to Train

 "When determining whether a municipality has adequately trained its employees, 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.'"  *Wright*, 962 F.3d at 881 (quoting *Jackson*, 925 F.3d at 834).  "To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate

for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ouza v. City of Dearborn Heights, Mich.*, 969 F.3d 265, 286–287 (6th Cir. 2020) (quoting *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).  In other words, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact." *City of Canton*, 489 U.S. at 388.  The court finds that McDonel also does not show a genuine dispute as to his failure-to-train claim.

McDonel argues that "it was a moral certainty that white police officers on patrol would encounter African-Americans who could be investigated, ticketed and have their vehicles towed."  (ECF No. 27, PageID.534).  He also argues that there is "a widespread pattern of discriminatory practices including investigating, ticketing and towing of African Americans."  (*Id.*).  According to McDonel, the City's training was deficient because "[t]he City could and should have trained officers, supervisors and investigators to review body cams, particularly when they had substantial complaints about the Sixth Precinct."  (*Id.*)

However, McDonel does not frame his claims as addressing an alleged failure to train the defendants in identifying probable cause under the interference statute or avoiding retaliatory stops—the two underlying constitutional claims at

issue here.  In fact, he does not actually name the constitutional injury caused by

the City's alleged failure to train at all.  He points out that he is African American,

and the individual Defendants are White officers who work out of a precinct that

has had a culture of racism against African Americans.  He also discusses the fact

that documented incidents of racism occurred on Klein's and Urista's shift and that

they received training from two officers who were found to have engaged in racist

conduct on multiple occasions.  According to him, "white police officers on patrol

would encounter African-Americans who could be investigated, ticketed and have

their vehicle towed."  (ECF No. 27, PageID.534).  Thus, based on his contention

that DPD has engaged in a widespread practice of discrimination against African

Americans and his proffer of evidence in support, it appears that McDonel is

arguing that the City's failure to train caused him to suffer an Equal Protection

violation based on race under the Fourteenth Amendment.  But McDonel has

neither brought nor developed a claim for race discrimination against the

individual Defendants—a necessary foundation for municipal liability based on

alleged widespread race discrimination.[4]  *See, e.g.*, *Stephans v. West Bloomfield*

---

[4] Moreover, McDonel's claim does not establish the necessary elements for a failure-to-train claim.  For example, his claim is based on: "The City could and should have trained officers, supervisors and investigators to review body cams, particularly when they had substantial complaints about the Sixth Precinct."  (ECF No. 27, PageID.534).  But he does not explain how inadequate body-camera review is connected to the ticketing and towing of African Americans and how the City was deliberately indifferent to that inadequate training; indeed, the Environmental Audit shows that the DPD recognized a problem with body-cam review and proposed "daily reviews of body worn camera video."  (ECF No. 25-4, PageID.454, 461).  He

*Twp.*, No. 13-14877, 2015 WL 6791527, at *9 (E.D. Mich. Nov. 6, 2015) ("If [plaintiff] meant to suggest that the basis of her *Monell* claim is a different constitutional violation [from her claims against the individual defendants], she has made no argument whatsoever nor pointed to any other evidence establishing that another type of constitutional violation occurred.").  "Where, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm."  *Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002).  If there is no underlying constitutional violation, then there can be no *Monell* liability.  Rather, in the context of a claim against a municipality, a plaintiff must establish both (1) an underlying violation of his constitutional rights, and (2) that the violation resulted from the municipality's own deliberately indifferent policies.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992) (explaining that "proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual

---

also does not show how body-camera training caused his—apparently Equal Protection—injury here.

police officer, the fact that the departmental regulations might have authorized the use of unconstitutionally excessive force is quite beside the point."); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *See also Nallani v. Wayne County*, 2015 WL 6795945 (E.D. Mich. Nov. 6, 2015) (dismissing defendant Wayne County because plaintiff failed to establish a constitutional violation by the individual defendants)).  As a result, the court **GRANTS** Defendants' Motion for Summary Judgment as to McDonel's failure-to-train claim under *Monell*.

        3.    <u>Discovery Dispute</u>

McDonel also argues that if the court were to find his evidence insufficient, then the court should require Defendants to produce evidence that supports its *Monell* claim.  (ECF No. 27, PageID.521, 534).  In support, he attaches Defendants' responses to his second discovery request.  (ECF No. 25-10).  But the court will not address this issue at this time.  First, McDonel has failed to identify exactly what discovery Defendants have not given him—precluding any meaningful relief.  Second, discovery closed in this matter some three weeks before Defendants filed their motion and Plaintiff took no steps to challenge the sufficiency of Defendants' discovery responses before that time.  Even now,

McDonel has declined to file a motion setting forth the basis for such relief.

McDonel's request is therefore both untimely and inadequately set forth.  *See, e.g.*,

*Suntrust Bank v. Blue Water Fiber, L.P.*, 210 F.R.D. 196, 200 (E.D. Mich. 2002)

("In numerous cases, courts have denied tardy discovery motions that were filed

after the close of discovery, especially where the moving party had all the

information it needed to timely file the discovery motion, and its late filing would

prejudice the non-moving party.") (collecting cases); *VCA Clinipath Labs, Inc. v.*

*Progressive Pet Animal Hosps., P.C.*, No. 11-CV-12237, 2013 WL 140916, at *3

(E.D. Mich. Jan. 11, 2013).  Hence, the court will not entertain McDonel's request.

## IV.    CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART AND**

**DENIES IN PART** Defendants' Motion for Summary Judgment (ECF No. 23).

Accordingly, McDonel's Fourth Amendment *Terry* stop claim and his First

Amendment retaliation claim under Count I survive.  His claim for *Monell* liability

against the City, however, fails.  McDonel abandoned his federal claims under 42

U.S.C. §§ 1983 and 1985 for conspiracy, excessive force, and malicious

prosecution, as well as his state law claims for false arrest, false imprisonment,

excessive force, malicious prosecution, and gross negligence; thus, as to those

claims, along with his *Monell* claim, the Motion for Summary Judgment is

**GRANTED**.  The court **DIMISSES WITH PREJUDICE** these claims.

**IT IS SO ORDERED**.

Date: August 13, 2021                    s/Stephanie Dawkins Davis
                                         Stephanie Dawkins Davis
                                         United States District Judge